**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

DENNIS HERB PICKERING,

      Plaintiff,

v.
                              Civil Action No. 2:13CV43
                              (The Honorable John Preston Bailey)

COMMISSIONER OF SOCIAL SECURITY,

      Defendant.

## REPORT AND RECOMMENDATION/OPINION

Dennis Herb Pickering ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("Defendant," and sometimes "Commissioner") denying the Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on May 10, 2010, alleging disability since August 1, 2001, due to back and hip problems, a heart disorder, and a blood disorder (R. 144, 172). Plaintiff amended his onset date to coincide with December 31, 2006, his date last insured (R. 22, 37-38). Plaintiff's application was denied at the initial and reconsideration levels due to the record containing no medical evidence relating to the relevant time period (R. 83-84). Plaintiff requested an administrative hearing, which Administrative Law Judge ("ALJ") Daniel F. Cusick held on

October 5, 2011, and at which Plaintiff, represented by counsel, and Larry Ostrowski, a vocational expert ("VE"), testified (R. 31-81). The ALJ issued a decision on November 3, 2011, finding Plaintiff was not disabled (R. 22-26). On April 11, 2013, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. STATEMENT OF FACTS

Plaintiff was born on September 21, 1953, and was fifty-three (53) years old on his date last insured (R. 144). Plaintiff completed high school and had past relevant work as a painter, plumber, and laborer (R. 173-74).

Plaintiff was examined by Dr. Meisner on February 21, 2010. Plaintiff had no insurance and Dr. Meisner found it had "been difficult to get an evaluation." Dr. Meisner noted Plaintiff was not positive for hepatitis C and there was "no clear explanation for thrombocytopenia" as his "prior blood counts indicate[d] he [had] a platelet count that [ran] around 60,000." Plaintiff reported memory loss. Dr. Meisner diagnosed thrombocytopenia and hypertension and noted "it would be helpful to get a bone marrow biopsy." Dr. Meisner further noted Plaintiff would "be getting a Medicaid card soon" (R. 365).

Dr. Meisner completed a hematology consultation of Plaintiff on April 30, 2010. He noted Plaintiff had "not seen physicians" even though he had had health issues. Plaintiff complained of hip and back pain. Plaintiff stated he smoked twenty (20) cigarillos per day. Plaintiff's wife reported he fainted, had no seizures, and hematuria. Plaintiff had no chest, cardiac, gastrointestinal, or neurologic symptoms. Upon examination, Dr. Meisner found he was afebrile, he had no lymphadenopathy in his neck, his chest was clear, his cardiovascular examination was benign, his abdomen was normal, and his extremities were normal. Plaintiff's PSA was normal; his renal

function test was normal; his liver function test was normal; his platelet count was "unremarkable." Dr. Meisner diagnosed thrombocytopenia, erythrocytosis, and syncopal episodes. Dr. Meisner found Plaintiff's erythrocytosis was "most likely" due to smoking and encouraged Plaintiff to cease smoking. Dr. Meisner "suspect[ed]" Plaintiff's thrombocytopenia was "due to occult liver disease." He ordered a CT scan of Plaintiff's abdomen and his head (R. 368).

Plaintiff's May 7, 2010, head CT scan was normal except it showed an "encephalomalacia within the inferior left temporal lobe, unchanged from 2007 and most likely from previous infarct or possibly from previous trauma" and "atherosclerotic vascular calcification in the cavernous internal carotid arteries" (R. 280-81, 417-18).

The May 7, 2010, CT scan of Plaintiff's abdomen and pelvis showed clear lung bases; normal kidneys, spleen, pancreas, and adrenals; normal appendix and lymph nodes; two "small low density lesion[s]"; normal bones; and artherosclerotic vascular calcification (R. 416, 419-21, 783-84).

Plaintiff's May 7, 2010, right hip and lumbar spine x-ray showed "mild scoliotic deformity of the upper lumbar spine" and "diffuse disc space narrowing and end plate sclerosis which [was] mild to moderate." There was atherosclerosis within the aorta and "mild facet hypertrophy in the lower lumber spine" (R. 282, 422).

Plaintiff's May 7, 2010, echocardiographic report showed normal size left ventricle and systolic function; ejection factor at 60% to 65%; normal size and function of the right ventricle; normal size of the left atrium; no echocardiographic evidence of mitral valve prolapse; trace mitral insufficiency; trace tricuspid insufficiency; and no pericardial effusion (R. 306-09, 737-39).

Plaintiff underwent testing on May 12, 2010, for erythrocytosis and thrombocytopenia, and he was authorized to undergo a phlebotomy (R. 410-12, 414-15).

Dr. Meisner examined Plaintiff on May 12, 2010, and found he was positive for erythrocytosis. Plaintiff smoked, and Dr. Meisner thought Plaintiff had smoker's polycythemia. His air pulse oxygen was "good." Dr. Meisner found Plaintiff's hepatitis study was negative; his liver was normal. Dr. Meisner diagnosed thrombocytopenia and syncope. Dr. Meisner reviewed Plaintiff's stress test and echocardiogram and noted they were normal (R. 367).

Dr. Cowher examined Plaintiff on June 4, 2010, and found Plaintiff was in acute distress. He had no lymphadenopathy, thyromegaly, masses, or "JVD." His heart, lungs, and abdomen examinations were normal. He was negative for spinal tenderness. Plaintiff stated he had been "about the same." He experienced occasional chest discomfort but no shortness of breath. He had no nausea, vomiting, or diaphoresis. He "seemed to pass out" once. Dr. Cowher diagnosed chest pain, syncope, and bilateral hip pain. Plaintiff stated he continued to "pursue health care assistance" and did not "wish any further treatment or evaluation at this time" (R. 271).

Plaintiff reported to the emergency department of Weirton Medical Center on June 9, 2010, with elevated blood pressure and a "heavy chest" (R. 380). Plaintiff reported he experienced shortness of breath; he could not identify any aggravating factors or factors that relieved chest pressure. His examination was normal (R. 387-88). Dr. Allison noted Plaintiff's electrocardiogram ("EKG") showed normal sinus rhythm and "normal QRS and ST complex." Plaintiff had no evidence of acute ischemia or dysrhythmias. Plaintiff's "CPK," troponin, blood count, and hemoglobin were normal; however, Plaintiff's platelets were decreased to seventy-four (74). Dr. Allison recommended Plaintiff be admitted; Plaintiff refused because he did "not like hospitals" (R. 388). Plaintiff was diagnosed with acute chest pain (R. 380). He was treated with nitroglycerin, his pain was "gone," and he was released (R. 384, 388).

Plaintiff's June 9, 2010, chest x-ray showed clear lungs, stable cardiomediastinal silhouette, no evidence of pneumothorax, but atherosclerosis in the aorta (R. 268, 345, 393).

On June 26, 2010, an employee of the Social Security Administration noted Plaintiff had stated that he had not "seen a doctor from 2001 through 2006." The individual found that "[s]ince there is no medical evidence in the relevant time period, the case is not being sent to MCS and will be denied for insufficient evidence prior to the DLI of 12/31/06" (R. 214).

Dr. Singh wrote a letter to Dr. Meisner on July 26, 2010, relative to his evaluation of Plaintiff. Dr. Singh wrote that Plaintiff reported "staring into space and then" going to sleep with no clonic or tonic convulsions or unconsciousness for the past two (2) years. Plaintiff reported falling, right leg weakness and tremors, and being off balance. Plaintiff reported a past head injury. Dr. Singh noted that, upon examination, Plaintiff was "rather slow in his responses." Plaintiff was alert, but his speech was slow and slurred. Plaintiff's "carotids [were] pulsatile." His cranial nerve examination was unremarkable. Dr. Singh's "significant finding was weakness in the right arm and right leg." Plaintiff's "power" was graded at 3/5. Dr. Singh found Plaintiff was ataxic and walked on a broad base. He had a right-hand tremor; his deep tendon reflexes were "rather sluggish." Dr. Singh found Plaintiff was "probably having minor motor seizures." Dr. Singh reviewed Plaintiff's CT scans and advised him to get an electroencephalogram (R. 304, 755).

Dr. Singh examined Plaintiff on August 12, 2010. Plaintiff reported he was tired, forgetful, and "very slow." He had tremors in his hands. He could complete activities of daily living with assistance (R. 301, 752). Dr. Singh diagnosed past head injury, dementia, and Parkinson's disease and prescribed Sinemet and Aricept (R. 302, 753).

Plaintiff was examined by Dr. Cowher on August 13, 2010. Plaintiff stated he was "doing

about the same." He had been recently diagnosed with Parkinson's disease and "memory difficulties." He medicated with Sinemet and Aricept. Plaintiff reported chronic low back and hip pain. Plaintiff had difficulty ambulating and using his hands. Plaintiff reported he was "following up with oncology in regard to thrombocytopenia." Plaintiff reported he experienced occasional chest discomfort; his blood pressure was elevated. Plaintiff stated he had passed out once, but was "amnesic for this." Upon examination, Dr. Cowher found Plaintiff was in no acute distress. His neck pulses were +2. He had no lymphadenopathy, thyromegaly, masses, "JVD," murmur, rub, or gallop. Plaintiff's lungs were clear and abdomen was normal; he had no spinal tenderness and no edema. He had a resting tremor in his right hand. His strength was 4+/5 and symmetric. His deep tendon reflexes were 2+ and symmetric. Dr. Cowher diagnosed Plaintiff with Parkinson's disease, low back pain, a tremor, thrombocytopenia, hypertension, and chest pain with possible syncope. Dr. Cowher instructed Plaintiff to "continue medications as prescribed by neurology." He prescribed Metoprolol and instructed Plaintiff to follow-up with his oncologist. Plaintiff did not "wish to pursue chest pain or syncope any further at this time secondary to insurance status" (R. 260).

Dr. Singh examined Plaintiff on October 14, 2010, who complained of headache, chest pain, forgetfulness, and being off balance. Plaintiff stated he was not doing well. There was no change in his motor strength (R. 299, 750). Dr. Singh diagnosed past head injury, dementia, and Parkinson's disease and prescribed Aricept and Sinemet (R. 300, 751).

Plaintiff presented to Dr. Mannino on November 15, 2010, with complaints of chest pain with no radiation. Plaintiff described his pain as "tight" and "onset followed stress." Plaintiff experienced these symptoms intermittently. Dr. Mannino's examination of Plaintiff's respiratory, cardiovascular, gastrointestinal, musculoskeletal, and neurological systems, except for chest pain,

were normal. Plaintiff's blood pressure reading was 140/100 (R. 734-35). Plaintiff was diagnosed with chest pain and hypertension; he was prescribed Benicar (R. 735). Dr. Mannino gave Plaintiff the "option" to undergo a heart catheterization; Plaintiff wanted to "think about it" (R. 736).

Plaintiff presented to Dr. Mannino on December 7, 2010, with complaints of chest pain. Plaintiff described his pain as "heavy"; the onset was "gradual." He had no radiation. Plaintiff stated his symptoms were exacerbated by exercise and anxiety; he experienced three (3) episodes per day, and his symptoms were relieved by ingesting nitroglycerine. Except for chest pain, Plaintiff's examination was normal (R. 610-11, 727). Dr. Mannino advised Plaintiff to "consider heart catheterization"; Plaintiff stated he would undergo a catheterization (R. 728).

Plaintiff's December 8, 2010, EKG showed a "narrow complex rhythm with a rate of 63. Severe baseline artifact" at "2109" and "narrow complex rhythm with a rate of 78. Baseline artifact" at "2112" (R. 532, 534). Plaintiff's December 9, 2010, EKG showed "sinus bardycardia. Nonspecific ST-T changes" (R. 536). Dr. Mannino ordered a left heart catheterization (R. 538).

Plaintiff presented to Dr. Meisner on December 8, 2010, for a hematology/oncology consultation. He noted he had performed a bone marrow biopsy earlier on Plaintiff, Plaintiff was to return for "followup visits," but he "failed to show up." Plaintiff reported he was attempting to stop smoking. Dr. Meisner found Plaintiff was alert and was in no acute distress. Plaintiff had a 1/6 systolic ejection murmur. His platelet count was 60,000. His white blood count and hematocrit were "increased as before." Dr. Meisner diagnosed chronic thrombocytopenia, suspected "idiopathic thrombocytopenic purpura, and no cirrhosis" (R. 618).

Dr. Mannino examined Plaintiff on December 9, 2010. He noted Plaintiff's symptoms of chest pain occurred with activity and were relieved with rest and nitroglycerine. Dr. Mannino noted

Plaintiff's stress test was negative for ischemia. Plaintiff reported he experienced symptoms more frequently; he developed "left precordial chest pain, nonradiating and not associated with any shortness of breath," when he did his laundry the evening before his appointment. Plaintiff smoked one and one-half (1 ½) packages of cigarettes per day. Plaintiff's examination was normal; he was pain free (R. 620). Dr. Mannino diagnosed exertional angina, "suspicious for coronary artery disease," hypertension, and hyperlipidemia and ordered a heart catheterization (R. 621).

Dr. Cowher treated Plaintiff on December 9, 2010, for chest pain he experienced on December 8, 2010. Dr. Cowher noted Plaintiff had no shortness of breath, no diaphoresis, no nausea, no vomiting. He was "much improved." Plaintiff's examinations were normal (R. 607). He was in no acute distress. His lungs were clear; his heart rate and rhythm were regular. He had no murmur, rub, or gallop. His cranial nerves and sensory were grossly intact. His deep tendon reflexes were 2+ and symmetrical. Plaintiff was positive for tremors (R. 608).

On December 13, 2010, Plaintiff underwent a left heart catheterization. It showed "right dominant"; "LAD (mid), eccentric discrete 50% lesion"; "RAMUS (Ostial), diffuse luminal irregularities 20& lesion"; "CIRC (Proximal), diffuse luminal irregularities 20% lesion"; "RCA (Mid), diffuse luminal irregularities 10% lesion"; and "LVEF Status: LV Gram-60%" (R. 252-53, 649-61, 731-33). He was discharged from Weirton Medical Center (R. 574-76).

Plaintiff's December 16, 2010, Lexiscan Rest/Stress Sestamibi Myocardial Perfusion Study showed "no clinical or electrocardiographic evidence of ischemia," normal perfusion with no evidence of inducible ischemia, and normal left ventricular systolic function (R. 250, 729). He had no cardiac arrhythmias, no chest pain, and no shortness of breath during the test (R. 251, 730).

Plaintiff presented to Dr. Mannino on January 17, 2011, for a follow-up examination.

Plaintiff had no complaints.  He continued to medicate his conditions.  Plaintiff had no chest pain or shortness of breath.  Plaintiff's blood pressure was 110/80.  He was diagnosed with coronary artery disease, hypertension, hyperlipidemia, and history of Parkinson's disease.  Dr. Mannino prescribed Simvastatin and instructed Plaintiff to stop smoking (R. 726).

Dr. Singh evaluated Plaintiff on January 27, 2011, for complaints of bladder control issues and tremors in his hands and legs. Dr. Singh diagnosed possible head injury, dementia, and Parkinson's disease and prescribed Sinemet, Aricept, and Cogentin (R. 297-98, 748-49).

Plaintiff presented to Dr. Mannino on March 29, 2011, for a follow-up examination.  Plaintiff had no complaints.  He continued to medicate his conditions.  Plaintiff had no chest pain or shortness of breath.  Plaintiff's respiratory, cardiovascular, gastrointestinal, musculoskeletal, and neurological systems were normal (R. 724).  Plaintiff was in no acute distress and was alert and oriented.  He had normal breath sounds; he had no bruits in his carotid auscultation and abdominal aorta auscultation.  His pulses were normal; he had no thrills.  He was diagnosed with coronary artery disease, hyperlipidemia, hypertension, and Parkinson's disease (R. 725).

Plaintiff was examined by Dr. Singh on April 28, 2011.  Plaintiff stated he was not feeling well; he had headaches.  Dr. Singh diagnosed Parkinson's disease, dementia, and thrombocytopenia.  Dr. Singh prescribed Cogentin, Aricept, Sinemet, and Ambian (R. 295-96, 746-47).

Dr. Mannino examined Plaintiff on July 12, 2011, relative to angina.  Plaintiff complained of chest pain and shortness of breath.  He experienced no radiation.  Plaintiff described his pain as "pressure-like."  Plaintiff's pain occurred daily and was listed as "moderate in severity and worsening."  Exertion exacerbated Plaintiff's symptoms and those symptoms were relieved by rest and nitroglycerin.  Plaintiff was fatigued.  Dr. Mannino noted he had not treated or examined

Plaintiff in the prior six (6) months. Plaintiff medicated with Simvastatin, Nitrostat, Metoprolol, Citalopram Hydrobromide, Carbidopa-Levodopa, Aricep, aspirin, and Benicar (R. 721). Except for chest pain, Dr. Mannino's examination of Plaintiff's respiratory, cardiovascular, gastrointestinal, musculoskeletal, and neurological systems were normal. Plaintiff's blood pressure was normal. Plaintiff was in no acute distress; he was alert and oriented (R. 722). Dr. Mannino diagnosed coronary artery disease, angina, hyperlipidemia, hypertension, thrombocytopenia, and Parkinson's disease (R. 723).

A Lexiscan Rest/Stress Sestamibi Myocardial Perfusion Study was completed on Plaintiff on July 14, 2011. It showed "no clinical or electrocardiographic evidence of ischemia"; normal left ventricular systolic function; no significant change from the December, 2010, study; and "abnormal perfusion imaging with no evidence of inducible ischemia" (R. 245, 719). Plaintiff's wall motion was normal. There was a "small perfusion defect . . . of mild intensity in the basilar and mid inferior regions" (R. 719).

On July 28, 2011, Plaintiff was examined by Dr. Singh. Plaintiff stated he had tremors, shaking in his arm and leg, and headaches. Plaintiff stated he could complete activities of daily living with help (R. 293, 744). Dr. Singh diagnosed dementia, past head injury, and Parkinson's Disease. He prescribed Klonopin and provided samples of Aricept to Plaintiff (R. 294, 745).

Dr. Singh examined Plaintiff on August 22, 2011. Plaintiff reported he had "problems" with bladder and bowel control and tremor in his hands. Plaintiff stated he could perform activities of daily living with "some help" (R. 291, 742). Dr. Singh diagnosed thrombocytopenia, cerebrovascular accident, and dementia. Dr. Singh instructed Plaintiff to use a cane to ambulate and prescribed Aricept and Klonopin (R. 292, 743).

Plaintiff, through counsel, filed a pre-hearing memorandum on October 5, 2011 (Index at p. 2; R. 224). Plaintiff listed the following impairments, which had affected him beginning December 30, 2006: Parkinson's disease; dementia/Alzheimer's disease; blood disorder; enlarged prostate; scoliosis and joint problems; coronary artery disease/angina; hypertension; stroke; and depression and anxiety (R. 225-26, 807-08). Plaintiff described his Parkinson's disease symptoms as "uncontrollable shaking, tremors, etc.," for which Plaintiff "was forced to leave" his last job. He could not maintain his balance; he had difficulty communicating; he had difficulty standing, walking and driving; his symptoms caused "frustration, anger, etc."; and he had difficulty staying on task. Plaintiff's dementia/Alzheimer's disease symptoms included "problems" with memory, focus, and concentration; difficulty sleeping; and episodes of "wandering." Plaintiff's blood disorder manifested itself in fatigue (R. 225, 807-08). Plaintiff's scoliosis and joint symptoms were back and hip pain, difficulty walking and standing, and limited stability and mobility. Plaintiff's coronary artery disease and angina symptoms were chest pain, which caused Plaintiff to be "off task"; fatigue upon exertion; and frustration and anger (R. 226, 807-08).

Administrative Hearing

At the administrative hearing, Plaintiff's counsel informed the ALJ that he would submit "supplemental information from Dr. Singh" (R. 35-36, 39). The ALJ granted Plaintiff's request to amend his onset date to December 31, 2006 (R. 38).

Plaintiff testified he had "problems" with his memory (R. 40). Plaintiff stated he had experienced symptoms for an extended period of time, but he did not seek treatment because he had no insurance coverage (R. 45). Plaintiff had "problems" with basic skills, such as writing. His hands shook (R. 46). He had worked as a general laborer, but he had not been "doing" his job "right," his

"boss would "holler[] and scream[]" at him, and he quit in December 2001 (R. 48). He had difficulty hitting nails with a hammer and "lin[ing] things up" (R. 49-50). Plaintiff's condition continued to deteriorate (R. 51). He had arm tremors, which would wake him at night (R. 52). His Parkinson's disease symptoms affected his balance (R. 53). He ambulated with a cane. He had hip pain. He was frustrated and angry, which affected his ability to stay focused (R. 54). Plaintiff testified that he had been diagnosed with dementia and Alzheimer's disease, which affected his memory. The symptoms were present prior to 2006. He had difficulty sleeping because he shook (R. 55). Plaintiff's testified his blood disorder caused fatigue. He had this condition "for years" (R. 56). Plaintiff stated he had "problems" with his hips and back and had been diagnosed with scoliosis prior to 2006. He had difficulty walking (R. 57). Plaintiff reported he had coronary artery disease, with pain (R. 58). Plaintiff experienced chest pain prior to 2006 (R. 59). Plaintiff testified he had been treated for prostate problems and a stroke (R. 60).

Plaintiff testified he woke two (2) or three (3) times per night and had done so "for years" (R. 61-62). Plaintiff felt as if he was in a haze due to lack of sleep. He would "cut grass . . . on the tractor" (R. 62). He could not perform this task on a regular basis; he had no hobbies (R. 63). He could not hunt or fish; however, he fished once in 2011 with his grandsons (R. 64). Plaintiff stated he could "walk pretty good," but he had to know where he was walking or he could fall. He could walk a block (R. 66-67). He could not walk straight. He could stand for "a couple minutes" (R. 67). Plaintiff stated he could lift firewood in 2006; he could throw it in his truck (R. 68). He could lift one log at a time (R. 69).

Evidence Post-Hearing

By cover letter dated October 24, 2011, Plaintiff, through counsel, filed a Residual Functional

Capacity ("RFC") Questionnaire completed by Dr. Singh (R. 815-17). Dr. Singh wrote he had treated Plaintiff for various medical conditions and confirmed his records showed Plaintiff had been diagnosed with Parkinson's disease, dementia, Alzheimer's disease, blood disorder, scoliosis, coronary artery disease, a history of angina, stroke, enlarged prostate, depression, and anxiety. Dr. Singh wrote Plaintiff's condition "continued to deteriorate over time." Dr. Singh wrote Plaintiff's condition "would have affected his ability to function during the period from December 31, 2006" and continuing to the date of the questionnaire. Dr. Singh agreed with Plaintiff's assertion that, from December 31, 2006 to the present, his conditions "severely impaired his ability to stay on task, maintain pace and persistence, [and] meet the normal expectations of work." Dr. Singh wrote he had "confirmed the existence of the various conditions through diagnostic testing." He noted that whether Plaintiff's conditions caused him to be off task from December 31, 2006 until the present was "not applicable" because Plaintiff was "not working" (R. 816). Dr. Singh did not list how frequently Plaintiff would be absent from work due to his conditions because such information was "not applicable." Dr. Singh found Plaintiff was unable to sustain regular, routine, full-time employment from December 31, 2006 to the present (R. 817).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Cusick made the following findings:

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2006.

2.  The claimant did not engage in substantial gainful activity through the date last insured (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, there were no medical signs or laboratory

findings to substantiate the existence of a medically determinable impairment (20 CFR 404.1520(c)) (R. 24).

4.    The claimant was not under a disability, as defined in the Social Security Act, on December 31, 2006, the date last insured (20 CFR 404.1520(c)) (R. 25).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" Hays, 907 F.2d at 1456 (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Dr. Singh's Post-Hearing Questionnaire

Plaintiff raises only one contention in support of his motion for summary judgment. He argues that the ALJ failed to "acknowledge []or give any consideration to the Residual Functional Capacity Statement (RFC) completed by [his] primary treating physician, Sarjit Singh, M.D. of Ohio Valley Neurology Associates." (Plaintiff's Brief at 2.) He states that this RFC "provides medical analysis and support to find that [he] was disabled as of his date last insured and continued to be disabled through the date of his report." (Id. at 3.) Plaintiff asserts that this failure caused the ALJ to erroneously stop his analysis at Step Two of the sequential evaluation. (Id.) Defendant argues that the questionnaire completed by Dr. Singh has "no probative value" and that there is "no chance" that it "would have changed the ALJ's decision in this case." (Defendant's Brief at 4-5.)

"To qualify for DIB, [Plaintiff] must prove that []he became disabled prior to the expiration of [his] insured status." Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005) (alterations in original); see also Henley v. Comm'r of Soc. Sec., 58 F.3d 210, 213 (6th Cir. 1995) (upholding denial of DIB because claimant failed to prove disability prior to loss of insured status). To establish a medically determinable impairment, Plaintiff must demonstrate that he has "anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. Impairments "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's statement of symptoms." Id. (alteration in original). Therefore, "regardless of how many symptoms an individual alleges, or how genuine the individual's complaints may appear to be, the existence of a medically determinable physical or mental impairment cannot be established in the absence of objective medical abnormalities; i.e., medical signs and laboratory findings." Social

Security Ruling ("SSR") 94-4p, 1996 WL 374187, at *1 (July 2, 1996).  If there are no "medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment" in the record, then the claimant "must be found not disabled at step 2 of the sequential evaluation process."  Id. at *2.

The Fourth Circuit has stated that "[m]edical evaluations made after a claimant's insured status has expired are not automatically barred from consideration and may be relevant to prove a disability arising before the claimant's [date last insured]."  Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 340 (4th Cir. 2012) (alteration in original) (citing Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987)).  For example, in Moore v. Finch, 418 F.2d 1224, 1226 (4th Cir. 1969), the Fourth Circuit held that an examiner from the Administration erred by failing to retrospectively consider evidence dated between six and seven years after the claimant's date last insured ("DLI") because that evidence could have been "reflective of a possible earlier and progressive degeneration."  Accordingly, "post-DLI medical evidence generally is admissible in an SSA disability determination in such instances in which that evidence permits an inference of linkage with the claimant's pre-DLI condition."  Bird, 699 F.3d at 341.  Such "retrospective consideration of medical evidence is especially appropriate when corroborated by lay evidence."  Id. at 342.

The claimant in Bird "allegedly suffer[ed] from PTSD as a result of his combat experiences in Vietnam."  Id. at 339 (alteration in original).  He asserted that his disabling PTSD began on January 1, 2001, several years before his DLI of March 31, 2005.  Id.  Bird applied for veterans benefits, and the Veterans' Administration ("VA") awarded him a 100 percent disability rating on November 14, 2007.  Id.  That rating was effective June 9, 2006.  Id.  Bird's administrative record did not contain any medical evidence pre-dating his DLI.  Id.  However, the VA rating decision

"summarized evidence that Bird suffered from severe symptoms of PTSD before June 2006, and before his DLI." Id. at 341. Furthermore, "the September 2007 psychological examination conducted by the VA indicated that Bird's symptoms of PTSD had been ongoing since his return from military service in Vietnam." Id. Additionally, a report prepared by after licensed clinical psychologist Dr. Spurgeon Cole's evaluation of Bird "not only enumerated Bird's many current symptoms of PTSD, but also recounted Bird's impairments and their impact, which occurred long before his DLI." Id. at 339-40, 342.

During his administrative hearing, Bird testified that "his various PTSD symptoms were difficulties that he had experienced for 'years and years before' March 2005." Id. at 342. Bird's wife "stated that Bird had exhibited PTSD symptoms 'for a long time,' and that they had become progressively worse over the years." Id. Additionally, two counselors from the VA "provided a letter to the Appeals Council, explaining that Bird had experienced PTSD symptoms '[s]ince he returned from the combat zone.'" Id. The Bird Court determined that this lay evidence, when considered with the medical evidence summarizing Bird's pre-DLI symptoms, "provided a sufficient linkage 'reflective of a possible earlier and progressive degeneration.'" Id. The Fourth Circuit remanded the matter for the Administration to give retrospective consideration to the medical evidence discussed above. Id. at 345.

Here, at Step Two of the sequential evaluation, the ALJ stated:

At the hearing, the claimant testified that he stopped working in 2001 due to his physical problems. Further, he reported that his physical problems were related to his back, hip, and heart conditions, as well as a blood disorder. (Exhibit 2E). Additionally, he testified that after he stopped working in 2001, his condition did not get better, his condition deteriorated, he was unable to return to work, and he was unable to go to the doctor due to a lack of medical insurance. Also, the claimant's attorney submitted a pre-hearing memorandum in which he stated that the claimant

had multiple disabling impairments that included Parkinson's Disease. (Exhibit 12E).

Although the claimant alleged that he was disabled prior to the date last insured, December 31, 2006, there is no medical evidence in the record for that period. As stated above, a medically determinable impairment must be established by objective medical evidence consisting of signs, symptoms, and laboratory findings and if no such evidence exists to substantiate the claimant's allegations, the claimant must be found not disabled. Additionally, August 2010 office notes indicate that the claimant was "recently" diagnosed with Parkinson's Disease, which indicates that he was not objectively diagnosed with this condition during the period at issue. (Exhibit 2F). Although the medical evidence contained in the record indicates that the claimant was diagnosed with medically determinable impairments in 2010 and 2011, unfortunately there is no objective medical evidence to indicate the claimant had a severe impairment through the date last insured. (Exhibits 1F-15F).

Accordingly, there were no medical signs or laboratory findings to substantiate the existence of a medically determinable impairment through the date last insured.

(R. at 25.)

Like in Bird, the record before ALJ Cusick contained no evidence pre-dating Plaintiff's DLI. Unlike in Bird, however, none of this medical evidence summarizes Plaintiff's symptoms, impairments, and their impacts with regard to the period pre-dating Plaintiff's DLI. For example, none of the medical evidence mentions a diagnosis of Parkinson's disease until Dr. Singh's notes from Plaintiff's August 12, 2010 examination. (R. at 301, 752.) At no time did Dr. Singh mention that Plaintiff had exhibited symptoms of Parkinson's disease since on or before December 31, 2006. Furthermore, Dr. Cowher mentioned during Plaintiff's August 13, 2010 examination that Plaintiff had "recently been diagnosed with Parkinson's disease as well as some memory difficulties." (R. at 260.) The undersigned does not construe the term "recently" as referring to a time approximately four years prior, when Plaintiff was last insured. Although the medical providers do recite Plaintiff's medical history, "[s]imply reciting a claimant's medical history does not act to relate the claimant's medical condition back to an earlier date such as to opine about his limitations at that earlier point

18

in time." Abney v. Astrue, No. 5:07-394-KKC, 2008 WL 2074011, at *7 (E.D. Ky. May 13, 2008). The undersigned notes that Plaintiff did testify throughout the hearing that his alleged symptoms and impairments began prior to his DLI. (See R. at 43-69.) However, the medical evidence's only relation back to Plaintiff's condition before his DLI "stems from [Plaintiff's] own reporting of [his] alleged impairments and medical history." Wilkins v. Colvin, No. 7:12-CV-324-FL, 2014 WL 1057384, at *8 (E.D.N.C. Mar. 17, 2014).

As noted above, Plaintiff claims that the ALJ erred by (1) not making Dr. Singh's RFC questionnaire, submitted after the administrative hearing, part of the record and (2) not considering it in his decision. The record reflects that Dr. Singh's questionnaire was considered by the Appeals Council when it affirmed the ALJ's decision. (R. at 1.) The undersigned construes Plaintiff's claim to state that the Appeals Council erred by not remanding the case to the ALJ for consideration of Dr. Singh's RFC questionnaire.

In Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council must consider additional evidence that was not submitted to the ALJ if the evidence is (1) new, (2) material, and (3) relates to the period on or before the date of the ALJ's decision. "New evidence is evidence which is not duplicable or cumulative. Evidence is 'material' if there is a reasonable possibility that it would have changed the outcome." Id. at 96. Evidence relates to the period on or before the date of the ALJ's decision if it provides evidence of a plaintiff's impairments at the time of the decision. See Johnson, 434 F.3d at 655-56.

In the questionnaire, Dr. Singh opined that he had treated Plaintiff for his various medical conditions, including Parkinson's disease, dementia; Alzheimer's disease; blood disorder; scoliosis;

19

coronary artery disease; a history of angina; stroke; enlarged prostate; depression and anxiety. (R. at 816.) He also stated that Plaintiff's condition would have affected his ability to function during the period from December 31, 2006 continuing through the present and that his conditions severely impair his ability to stay on task, maintain pace and persistence, and meet the normal expectations of work. (Id.) Dr. Singh wrote that he had "confirmed the existence of the various conditions through diagnostic testing" and that whether Plaintiff's conditions had caused him to be off task from December 31, 2006 to the present was "not applicable" because Plaintiff was "not working." (Id.) He did not state how frequently Plaintiff's conditions would cause him to be absent from work because that information was not applicable. (R. at 817.) Dr. Singh concluded that Plaintiff's conditions precluded him from sustaining regular, routine, full-time employment from December 31, 2006 until the present. (Id.)

Dr. Singh's questionnaire is clearly new evidence, as it is the only RFC statement in the record and is therefore "not duplicable or cumulative." Wilkins, 953 F.2d at 96. Furthermore, it relates to the period on or before the date of the ALJ's decision because it provides some evidence of Plaintiff's impairments as of November 3, 2011, the date of the ALJ's decision. See Johnson, 434 F.3d at 655-56. However, as discussed below, the undersigned finds that Dr. Singh's RFC questionnaire is not material.

"Evidence is 'material' if there is a reasonable possibility that it would have changed the outcome." Wilkins, 953 F.2d at 96. According to Plaintiff, if the ALJ had considered Dr. Singh's questionnaire, he would not have determined that Plaintiff was not disabled at Step Two of the sequential evaluation. The undersigned disagrees. As an initial matter, Dr. Singh's questionnaire was in a "check off" form, which has been referred to by other courts as "weak evidence at best."

20

See, e.g., Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."). Mason has been cited with approval by a number of district courts within the Fourth Circuit. See, e.g., Wright v. Astrue, 2013 WL 275993, at *5 (W.D. Va. Jan. 24, 2013); McGlothlen v. Astrue, 2012 WL 3647411, at *6 (Aug. 23, E.D.N.C. 2012); Bishop v. Astrue, 2012 WL 951775, at *3 n.5 (D.S.C. Mar. 20, 2012). Furthermore, Dr. Singh's RFC questionnaire is inconsistent with his own treatment notes. On August 12 and October 14, 2010, and January 27 and July 28, 2011, Dr. Singh diagnosed past head injury, dementia, and Parkinson's disease. (R. at 294, 297-98, 300, 302, 745, 748-49, 751, 753.) On April 28, 2011, he diagnosed Parkinson's disease, dementia, and thrombocytopenia. (R. at 295-96, 746-47.) On August 22, 2011, he diagnosed thrombocytopenia, cerebrovascular accident, and dementia. (R. at 292, 743.) Contrary to his statement in the RFC questionnaire, at no time during any of these examinations did Dr. Singh diagnose Plaintiff with scoliosis; coronary artery disease; angina; stroke; enlarged prostate; depression; or anxiety. Also contradictory is the fact that his treatment notes do not reflect that he conducted any diagnostic testing of Plaintiff.

The undersigned also notes that during the administrative hearing, Plaintiff's attorney mentioned that Dr. Singh had treated Plaintiff prior to his DLI and that he had asked Dr. Singh "to review old records." (R. at 39.) Nevertheless, these "old records" were never submitted to the Administration to be made part of the record, and so there is no evidence that Dr. Singh actually treated Plaintiff prior to December 31, 2006. Accordingly, the undersigned finds that because of the form nature and contradictions contained in Dr. Singh's RFC questionnaire, the questionnaire cannot be considered material because it would not have changed the outcome of the ALJ's Step Two determination. See Wilkins, 953 F.2d at 96; see also Johnson, 434 F.3d at 656 (noting that ALJ can

reject a treating source opinion submitted after the claimant's DLI when "there is no objective medical evidence that the impairments observed . . . existed prior to" the DLI).

In sum, Plaintiff's contention is without merit. The Appeals Counsel did not err in not remanding the case to the ALJ for consideration of Dr. Singh's RFC questionnaire because the questionnaire was not material evidence. Furthermore, there is no medical evidence in the record pre-dating Plaintiff's DLI. While the ALJ did note that some of the medical evidence summarizes Plaintiff's history of symptoms and impairments, he properly determined that the evidence post-dating Plaintiff's DLI did not sufficiently relate back to Plaintiff's condition before his DLI. Accordingly, the undersigned finds that substantial evidence supports the ALJ's determination that Plaintiff was not disabled at Step Two of the sequential evaluation.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment be **GRANTED**, and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984),

cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this __10__ day of April, 2014.

_____
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE